HAYDEN *vs.* THE ATLANTA COTTON FACTORY.

61  233
f 110  910

1. In a suit on a stock subscription, where one of the conditions was, that a certain amount should be subscribed before the contract was

binding, and the amount of subscriptions was in issue, there was no error in admitting the original subscription book shown to have been made up by copying from lists which were carried around to solicit subscriptions, and to have been accepted and used by the directors.

2. Declarations by a stock-holder subsequent to the date of his sub·scription, to the effect that he never intended to pay for the stock taken by him, but took it in order to make up the requisite amount, are not admissible to show fraud, in a suit by the corporation on the contract of another stock-holder.

3. Where no plea is filed at the first term, *non est factum* cannot be pleaded at a subsequent term; if the general issue be pleaded at the first term, *non est factum* may afterwards be set up by way of amendment.

4. The directors having approved and accepted subscriptions to stock of sufficient amount to bind the stock-holders under their contracts, the burden of showing that any of such subscriptions were worthless or fraudulent, is on the party setting up such defense.

5. Nothing being specified in the contract of subscription in regard to allowing payment for stock otherwise than in money, and the directors having received subscriptions payable in specifics, the burden was on the corporation to show that they were the equivalent of cash paid in the regular way.

Corporations. Stock. Contracts. Evidence. Pleading. Practice in the Superior Court. *Onus probandi*. Before Judge. CLARK. City Court of Atlanta. December Term, 1877.

Reported in the decision.

COLLIER & COLLIER, for plaintiff in error, cited as follows : *Non est factum*, error to strike, Code, §3479 ; 19 *Ga.*, 505 ; 54 *Ib.*, 59 ; 59 *Ib.*, 157 ; 60 *Ib.*, 50.   Directors agents of plaintiff, 18 *Ga.*, 434 ; 57 *Ib.*, 240 ; Abbott on Corp., 8. Payment in specifics, 8 Gray, 596.   Charge not founded on evidence, 51 *Ga.*, 289 ; 52 *Ib.*, 632.

HOPKINS & GLENN, for defendant, cited as follows : Declaration good, 22 *Ga.*, 586.   Special plea bad, Code, §2757 ; 13 *Ga.*, 208–210 ; 39 N. H., 491 ; 5 Snead (Tenn.), 567 ; 1 Red. on R'lw's., 159–160 ; 24 Vt., 465.   *Non est factum* properly stricken, Code, §2851.   Subscription book admis-

sible, 41 Me., 517, 518; 40 *Ib.*, 175.   Admissions not evidence, 41 Me., 512.   Directors determine amount of stock taken, 41 Me., 521.   Payment in specifics, 2 Met. (Ky.), 219.   *Bona fides* at time of subscribing, 40 Me., 172–175.

WARNER, Chief Justice.

At the December term, 1876, of the city court of Atlanta, the Atlanta Cotton Factory Company brought complaint (in short form) against Julius A. Hayden, on a contract of subscription alleged to have been made by said Hayden to the capital stock of said company.   Attached to said complaint was a contract of subscription, of which the following is a copy:

"Subscription to the capital stock of the Atlanta Cotton Factory Company.

"We, the undersigned, hereby agree to take the number of shares of capital stock of the Atlanta Cotton Factory Company set opposite our respective names, and to pay for the same, at the rate of one hundred dollars per share, upon the following terms and conditions, to-wit:

"1. It is agreed that the assessments shall be at the rate of one dollar per week per share for fifty weeks, and then at the rate of two dollars per share per week for twenty-five weeks, payable weekly or once in four weeks, as the subsribers may elect and stipulate at the time of subscribing.

"2. It is agreed that no subscription shall become binding or of force until 2,500 shares ($250,000) shall have been subscribed.

"3. It is agreed that at any time within thirty days after one thousand shares shall have been subscribed, the present executive committee shall call a meeting of the subscribers to the said one thousand shares or more, at such time and place as they may designate in their call, for the election of directors, in which election each share shall be entitled to one vote.

"4. It is agreed that assessments as aforesaid shall become due and payable at the end of the first week of the month next after said election, and the full amount of 2,500 shares have been subscribed.

"5. It is agreed that any subscriber who may choose to pay up his subscription in full at any time shall be entitled to a discount at the rate of ten *per cent. per annum* for the average of such advance payment.

"6. It is agreed that unless the entire amount of 2,500 shares shall

be subscribed on or before July 1, 1875, that the legal obligation to pay their subscription ceases to be binding upon subscribers.

" 7. It is agreed that the company shall have the right to make all rules and regulations and by-laws which they may deem expedient for the protection of their interests not inconsistent with this agreement.

" ATLANTA, January 4, 1875.

" J. A. HAYDEN, (10 Shares) $1000.00."

At the said December term, 1876, the defendant filed sworn pleas as follows :

1. The general issue.

2. "And for further plea in his behalf, this defendant says that said plaintiff ought not further to have or maintain its aforesaid action against him, because he says that at the time he authorized his name to be put down as a stockholder in said corporation, it was expressly agreed by and between this defendant and J. C. Kimball, who was then the agent of said corporation, soliciting and taking subscriptions for stock in said corporation, that the subscription for stock in said concern should not be binding on this defendant until the sum of two hundred and fifty thousand dollars of *bona fide* subscriptions should be made to said corporation, by solvent subscribers, from whom such stock, so subscribed, could be collected by legal process.

"This defendant avers that no such sum has been *bona fide* subscribed by solvent subscribers to such stock, and from whom such stock so subscribed could be collected by legal process, all of which this defendant is ready to verify," etc.

At the June term, 1877, of said court, this case came on for a hearing on the pleadings as above set forth, when defendant demurred to plaintiff's declaration, on the ground that there was no allegation in the said declaration that the conditions precedent set out in said contract of subscription had been complied with before suit was brought, which demurrer was overruled. Plaintiff then moved to strike defendant's special plea as above set forth, which motion was granted, and the plea stricken by order of the court. The defendant then amended his plea of the general issue by filing, as an amendment thereto, a formal plea of *non est*

*factum*, whereupon plaintiff claimed a surprise, and the case was, on plaintiff's motion, continued for the term. To the action of the court in overruling defendant's demurrer to plaintiff's declaration, and in sustaining plaintiff's motion to strike defendant's special plea, the defendant then and there tendered exceptions *pendente lite*, and had the same allowed and signed by the presiding judge, and filed in the clerk's office of said court.

At the December term, 1877, of said court, the case came on again for a hearing, and the court, on motion of plaintiff's counsel, ordered defendant's plea of *non est factum* stricken on the ground that it had not been filed at the first term, and the case then proceeded with defendant's sworn plea of the general issue in.

Plaintiff introduced Hannibal I. Kimball, who testified as follows:

The book presented to witness is the original subscription book of the Atlanta Cotton Factory Company. The question was then asked witness: "Has 2,500 shares of stock been subscribed for in said company?" Defendant's counsel objected to said question, and the objection was overruled, when witness answered that something more than 2,500 shares had been subscribed for. The original subscriptions were taken by a committee upon subscription lists. Those lists were handed into the office, and copied into the subscription book above testified about. The lists handed witness are all the original lists, except the one canvassed for by Mr. English, and the list shown witness was handed in by English as a copy of his list. The subscriptions embraced in the lists and on the book were all obtained on or before July 1st, 1875, and the subscription book was accepted and used by the stockholders when they met. The book now presented is the original minute book of the company. The subscription book was before the board at their meeting on the 25th day of May, 1875. Judge Hayden's name on the subscription book is the original subscription as to him. The subscription in other things than money

were for articles that were necessary for the building, improvement and use of the company, and for freight that would be due on articles so necessary, and were to be charged at the reasonable market price.

*Cross-Examined*—Question by defendant's counsel : " Is this (referring to name of J. A. Hayden on subscription book) Judge Hayden's handwriting ?" Ans. " It is not; but Judge Hayden authorized it to be put there." Plaintiff's counsel then moved to rule out the question and answer, which motion the court sustained, and withdrew the question and answer from the jury.

Witness continuing: I am a subscriber to 650 shares of the capital stock of the company, amounting to $65,000.00. My original subscription was for only 50 shares, but when the board of directors met on the 25th May, 1875, for the purpose of making some arrange ments about the closing of the subscription book, it was ascertained that only about $190,000.00 of the capital stock had been taken, and as the time allowed by the charter for procuring subscribers was almost out, I announced that I would take the 600 remaining shares. amounting to $60,000,00. I made this last sub. scription for the purpose of completing the 2,500 shares required, in order to make the other subscriptions valid and binding. I did intend to pay for said stock, or place it with my friends, and did place some $25,000.00 or $30,000.00 of said subscription. The subscription was made by me in good faith, and after talking with me about my intentions, the board of directors accepted my subscription, and declared that 2,500 shares had been subscribed for. Of my original subscription of $5,000.00, I have paid in cash about $1,900.00, and of the $60,000 subscription over $20,000 has been paid by my friends. At the time I made this last subscription I was worth $25,000 more or less. It was about two years after I had been discharged in bankruptcy. I had some capital employed in a Needle Factory, received as compensation for getting up the enterprise, which amounted to about $12,000 in the stock of said company in Massachusetts.

This was the first year after my discharge in bankruptcy. The second year I lost about as much as I made, and since that time have about made a living. There was no objection made by the board to my taking the $60,000 of stock.

Between $100,000 and $120,000 have been collected on all the subscriptions.

Geo. W. Adair for plaintiff: "I was a director of plaintiff's company, and was present at the meeting of May 20th, 1875, when the resolution declaring the 2,500 shares had been subscribed for was adopted, and in voting for the resolution I acted in good faith. I knew nothing of Kimball's condition or ability to pay. Should not think that a man worth only $20,000 or $25,000 could pay a subscription of $65,000. I depended a good deal on Kimball's *business tact*."

J. C. Peck, for plaintiff, testified to about the same as Adair.

Plaintiff then introduced from the minute book of the company the proceedings of the meeting of stockholders held February 27th, 1875, at which meeting, the secretary having announced that $142,000 of the capital stock had been taken, the following directors were elected: H. I. Kimball, J. E. Brown, J. C. Peck, J. W. English, E. P. Chamberlin, A. Murphy, Geo. W. Adair, S. M. Inman and C. W. Hunnicutt.

Also the proceedings of a directors' meeting, held March 6, 1875, at which meeting H. I. Kimball was elected permanent president, E. E. Rawson secretary and treasurer, and F. Cogin constructing engineer and superintendent. S. M. Inman resigned as director, and W. F. Herring was elected in his place.

Also the minutes of the meeting of May 20, 1875, in which occur the following proceedings:

"The president reported that 2,519 shares had been subscribed to the capital stock, whereupon Mr. English presented the following pre amble and resolutions, which were unanimously adopted:

"WHEREAS twenty-five hundred shares have been subscribed to the capital stock of this company, that being the amount required to

be subscribed by the terms of the subscription before the same became binding and of force; therefore,

"*Be it Resolved,* that said subscriptions are hereby declared binding and of force, and that the first installment of four dollars per share is hereby declared to be due and payable June 1, 1875, and each month thereafter, according to the prospectus of the company."

Plaintiff then introduced the original subscription list, and the copy of English's list, not necessary here to be set out, except as follows :

J. E. Brown, for W. & A. R. R., 100 shares, $10,000; payable in freight on W. & A. R. R. Co.

J. E. Brown, for Dade Coal Company, 50 shares, $5,000 ; payable in coal at market price.

J. H. Callaway, 1 share, $100; payable by the average.

Cook, Gunby & Co., 3 shares, $300; how payable, not stated.

George L. Cook, 5 shares, $500; payable by the average.

Samuel Dunlap, 1 share, $100; payable in four installments.

M. Dallas, 1 share, $100; payable by the average.

Elsas, May & Co., 2 shares, $200; payable in one installment, July 1, 1876.

John C. Fain, 5 shares, $500; payable by the average.

C. N. Gray & Co., 10 shares, $1,000; payable in lime at the kiln at lowest price.

John T. Grant, 5 shares, $500; payable in brick.

W D. Grant, 5 shares, $500; payable in brick.

L. J. Gartrell, 1 share, $100; payable by the average.

Howell & Co., 1 share, $100; donation, payable when factory is completed.

W. C. Henderson, 1 share, $100; payable quarterly.

J. P. Harrison & Co., 2 shares, $200; payable by the average.

W. A. Haygood, 1 share, $100; payable by the average.

C. J. Kicklighter, 1 share, $100; payable by the average.

W. J. & A. J. Kiser, 1 share, $100; payable by the average.

H. I. Kimball, 600 shares, $60,000; payable by the average.

J. P. Logan, 1 share, $100; donation, payable when factory is completed.

Moore, Marsh & Co., 5 shares, $500; payable in one installment, July 1, 1876.

B. Mallon, 1 share, $100; payable by the average.

J. C. McMillan, 1 share, $100; payable by the average.

Mrs. A. McCormick, 1 share, $100; payable by the average.

J. Norcross, 2 shares, $200; payable by the average.

J. S. Pemberton, $50; donation, payable when factory is completed.

Frank Rice, 1 share, $100; donation, payable when factory is completed.

J. W. Rutherford, 5 shares, $500; payable by the average.

J. E. Thompson, 1 share, $100; payable in one installment, July 1, '76.

L. W. Trammell, 5 shares, $500; payable by the average.

West, Edwards & Co., 5 shares, $500; payable in one installment July 1, 1876.

A. C. & B. F. Wyly, 2 shares, $200; payable by the average.

Thos. Alexander, 10 shares, $1,000; donation, payable when factory is completed.

Akers & Bro., 1 share, $100; payable in one installment, July 1, 1876.

Adair & Bro., 3 shares, $300; payable by the average.

Geo. W. Adair, 10 shares, $1,000; payable by the average.

B. B. Crew, 1 share, $100; payable quarterly.

Plaintiff closed.

James W. English, for defendant: "Was a director of plaintiff's company, and was present at the meeting of May 20th, 1875. When it was ascertained that only 1,900 shares had been taken, a discussion arose as to what should be done in order to get up the remaining stock, so as to make the subscriptions which had been obtained binding, when Mr. Kimball announced that he would take the remaining 600 shares, amounting to $60,000. This subscription was made by Mr. Kimball for the purpose of completing the 2,500 shares, and thus make the subscriptions binding which had been already made. Witness, at the time, knew nothing of Kimball's condition or ability to pay. Witness acted in good faith in voting to close the books."

Anthony Murphy testified to about the same as English, and, in addition, that there was about $20,000 of subscriptions taken (besides Kimball's) that were utterly worthless, but that he supposed they could work them in during the progress of the work, and in that view he acted in good faith. He asked Kimball as to his intentions about paying for the stock, and he said he would pay for it, or place it with his friends.

Testimony closed.

After argument of counsel and charge of court, the jury returned a verdict for plaintiff for amount sued for, with interest and cost. During same term, defendant moved the court for a new trial, on the following grounds, to-wit:

1. Because the court erred in overruling defendant's demurrer to plaintiff's declaration.

2. Because the court erred in sustaining plaintiff's demurrer to defendant's special plea.

3. Because the court erred in striking defendant's plea of *non est factum.*

4. Because the court erred in admitting, over defendant's objection, the book containing the names of subscribers for stock in said company, it appearing, from the evidence, that said book was a copy.

5. Because the court erred in allowing plaintiff to introduce evidence to show that the conditions precedent in said subscriptions had been complied with before suit brought, there being no allegation to that effect in plaintiff's declaration.

6. Because the court erred in refusing to allow defendant to prove by J. W. English and A. Murphy, witnesses whom he had sworn, and by whom the facts could have been proved, that he, Kimball, had said, since he made said subscription for $60,000, that he did not expect or intend, at the time he made the subscription, to pay for the same, but only took it to make up the $250,000 required by the charter, to make the other subscriptions for stock binding on the other subscribers.

7. Because the court erred in the following charge to the jury: "Under these rules (meaning the rules prescribed by the directors,) the directors had the right to prescribe the mode and manner in which the capital stock should be paid in, and to make provision for the same. My construction of that is, that if the directors had the right to prescribe the mode in which the stock should be paid, they would have the right, in case a man had subscribed to the capital stock in cash, to commute that subscription for labor and materials or either, at a fair valuation. If these directors, when a certain amount was subscribed, and that amount payable in materials or labor, at a fair valuation, or anything else, at a fair valuation, that was valuable, or that the company

needed, and which would answer the place of money, they had the right to take such subscription," there being no evidence on that point.

8. Because the court erred in the following charge, to-wit: "There must be somebody to decide whether the $250,000 has been subscribed or not. Each individual stockholder cannot—one officer cannot—and there must be authority somewhere to say when the $250,000 has been subscribed. Most clearly that authority is lodged in the directors, and when a man becomes a stockholder by subscription, he assents that the right and power to determine when the $250,000 is subscribed is lodged in the directors."

9. Because the court erred in the following charge, to-wit: "My judgment is that the power was granted to these directors, under the charter, to determine when the $250,000 was subscribed."

10. Because the court erred in the following charge, to-wit: "My idea is that the directors had the power to take subscriptions of stock in labor and materials, or any other specific, if such was necessary to the building of the factory. It is all subject to the discretion of the directors, and it is for them to say when it is needed."

11. Because the court erred in the following charge, to-wit: "The point is made that because Kimball was not at the time worth $60,000 his subscription should not be counted. I think his subscription is to be governed by the same principles as other subscriptions. The 1st of July, 1875, was approaching, and only $190,000 had been subscribed. (I say this because admitted on both sides.) If $250,000 should not be subscribed by the 1st of July, 1875, the whole enterprise was a failure. $190,000, the bulk of that amount, was subscribed. It is to be presumed that all interested in the erection of the factory had done their best towards getting up the $250,000, and had failed to get up that amount by $60,000. That is the situation of the board of directors, and the stockholders were pressing on them to go on, not only for the material good of the stockholders, but for the good

of the community in which they resided. This was the situation of the directors. What should they do? Kimball says that to make the matter sure, he would take the balance, $60,000. You have heard the testimony of these directors. Did they, in the taking of Kimball's stock, exercise due caution? Did they act in good faith, in solemn good faith? Did they believe that the subscription was necessary to the success of the enterprise, and that it was a subscription that would be honestly paid? If the subscription was good at the time, it could not be vitiated because subsequently it could not be paid. You can take into consideration the amount of money paid on it, if there was any money paid on it, any considerable or reasonable amount paid, or any amount proportionate to what the other stockholders paid, you will take that into consideration to estimate the good faith of the directors and of Kimball. If there has been any collusion between some of the stockholders and directors, if there was a combination between them to practice a fraud upon the other stockholders, that would be a bad subscription, and the *prima facie* case would be altered." This part of the charge, besides being contrary to law, is without evidence to support it.

12. Because the court erred in the following charge, to-wit: "This is a case in which there are very important principles, important amounts, and very important interests. This defendant is not the only one that will be affected by your verdict. If he should be released from his obligation it will follow that other stockholders will be released, and they could not be forced to pay. The same defense which will release him will release others."

13. Because the court erred in the following charge, to-wit: "You must be satisfied that the $250,000 was subscribed, and that it was so determined by the directors. If you decide it was, then it was your duty to find for the plaintiff $720.00."

14. Because the charge of the court is argumentative.

15. Because the verdict of the jury is contrary to the evi-

dence, contrary to the charge of the court, and contrary to law.

The hearing of said motion was, by an order of court, adjourned over until vacation, and, on the hearing, was overruled, and a new trial refused. To which action of the court defendant excepted.

The first and second grounds in the motion for a new trial were not insisted on here.

1, 2. There was no error in admitting in evidence the book containing the names of subscribers for stock in the company, nor in excluding Kimball's declarations as set forth in the sixth ground of the motion for a new trial.

3. The defendant having appeared at the first term of the court and filed his plea of the general issue, it was competent for the defendant to amend that plea at a subsequent term by filing a plea of *non est factum*, according to the rulings of this court in *Stanton vs. Burge*, 34 *Ga.*, 435; *Akin vs. The Ordinary of Bartow County*, 54 *Ga.*, 59; and *Cahn vs. Newhouse*, 69 *Ga.*, 50. When there is no plea filed by the defendant at the first term of the court, he cannot file a plea of *non est factum* at a subsequent term, by way of an amendment to his pleading, because he has no plea to amend by; but when there is enough in his pleading to amend by, he may do so. Code, §3479. The striking of the defendant's plea of *non est factum* was therefore error.

4. One ground of the defendant's defense against the payment of his subscription of stock to the company, is that 2,500 shares of stock, amounting to $250,000, was not *bona fide* subscribed on or before the 1st of July, 1875, as stipulated in his contract of subscription. The board of directors of the company having accepted and approved the subscription of the stock to the company to the amount of $250,000, the burden of proof was on the defendant to show that the subscriptions of stock were not real *bona fide* subscriptions, that the same, or some part thereof, were of no real value, and could not be collected; or that the same, or some part thereof, were bogus or fraudulent subscriptions.

5. In regard to the value of the subscriptions payable in things other than cash, the burden of proof was on the company to show that the specific articles of property and things subscribed, would be available to the company the same as cash, and in like installments as the cash payments, and at the same time when the cash ought to be paid in and expended in behalf of the company.

In the view which we have taken of this case, the charge of the court to the jury was error, and especially that portion of the charge embraced in the eleventh and twelfth assignments of error.

Let the judgment of the court below be reversed and a new trial be had in conformity with the views indicated in the foregoing opinion.

Judgment reversed.